**William BURGESS et al., Plaintiffs,**

v.

**Rhett MILLER et al., Defendants.**

**No. 79–0955.**

United States District Court,
N. D. Florida,
Tallahassee Division.

June 10, 1980.

Larry K. White, Tallahassee, Fla., for plaintiffs.

Bryan W. Henry and James R. English, Tallahassee, Fla., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

HIGBY, District Judge.

The Plaintiffs sued under the provisions of Title 42, United States Code, Section 1983 (1976), claiming the Defendants denied them due process when their jobs with the City of Tallahassee (City) ended. The Plaintiffs were all garbage collectors for the City's Sanitation Department. The Defendants are the City and some of its officials. Daniel Kleman is the City Manager. Rhett Miller is the City's Public Works Director. The Sanitation Department is a subdivision of Public Works.

## FINDINGS OF FACT

Early in the spring of 1978, many of Tallahassee's garbage collectors, including the Plaintiffs, were unhappy with their jobs. Differences in pay between new employees and old employees who performed the same work, inability to get a cost-of-living pay increase, and difficulties communicating with superiors bothered them most. Truman Smith was the most vocal dissident. Late in March, Truman Smith went to City Hall seeking a permit for the garbage collectors to parade downtown during work hours. While he was there, City Manager

Dan Kleman and Director of Employee Relations Evelyn Brion told him that a parade during work hours would constitute a strike and would be illegal. During that visit Truman Smith showed Ms. Brion a sheet of paper with the heading "Agreement to Strike Monday." There were 30 signatures on the sheet. All of the Plaintiffs had signed the sheet.

In the following weeks Ms. Brion; Mr. Kleman; Read Westcott, Director of the Solid Waste Division and Plaintiffs' supervisor; and Rhett Miller met several times to discuss the problems with the garbage collectors. They consulted frequently with the City's labor attorney, Jim Blue, and relied upon his advice. Defendants' consultations with Lawyer Blue were motivated more by fear of doing something legally unacceptable than any innate sense of fair play. Nonetheless, they took pains to obtain legal advice about the appropriateness of any action and its compliance with all legal requirements.

March 27, 1978, Rhett Miller met with the garbage collectors, including the Plaintiffs, and explained that any work stoppage or refusal to work would be a strike, would be illegal, and would cause immediate termination. April 7, 1978, Ms. Brion met with the garbage collectors, including the Plaintiffs, at the sanitation yard. She compared their salaries to those of collectors with the area's independent garbage collection service, pointing out the City paid higher salaries and offered more fringe benefits. She concluded that the City management believed the garbage workers were adequately paid and the City would not make the adjustments desired. The dissidents were not satisfied.

Monday, April 10, 1978, a number of garbage collectors, including all the Plaintiffs except Henry Smith, who was sick, refused to work until their demands for pay equalization and a satisfactory meeting with responsible officials were met. Rhett Miller met with four de facto leaders of the collectors, including Plaintiffs Truman Smith and Lindsey Ardley. He clearly set out the City's position that any refusal to work would be an illegal strike and cause for immediate dismissal. Truman Smith upon his return to the group continued to tell them the City was wrong and they could not be fired for striking. But he also relayed what Mr. Miller told him. All the Plaintiffs present understood they would be fired if they continued refusing to work.

The group was assembled for roll call and told they would be fired if they did not answer. None answered. Believing most of the men were misled and confused, the City officials decided to give them another chance. Read Westcott told the men they could take Monday off but should return Tuesday ready to work. Truman Smith and Lindsey Ardley, however, Westcott fired. He informed them orally of their discharge. Daniel Kleman made the final decision to discharge them after consulting with the other officials involved and Lawyer Blue. His reasons were three. Both had refused to work and therefore broken Florida's law prohibiting public employees from striking. Both had been repeatedly informed about a strike's illegality and its consequences and were no longer entitled to the benefit of the doubt. And both were misleading the other garbage collectors.

Tuesday morning, April 11, 1980, a letter from Leonard Carson, Chairman of Florida's Public Employees Relations Commission, was hand delivered to Kleman's office. Chairman Carson's letter set out the illegality of public employee strikes and the Commission's statutory duty to act when public employees strike. The letter ended with gentle firmness:

> If the City determines not to seek relief in court, please advise me immediately so that PERC may take appropriate action in keeping with its statutory responsibilities.
>
> I am certain that coordination of efforts will ensure prompt and proper resolution of this problem of mutual concern.

PERC's insistence upon rigorous enforcement of Florida's prohibition against public employee strikes was not the only pressure on the City and its officials. Garbage was piling up. No garbage was collected Mon-

day, April 10. Usually commercial garbage was collected on Mondays. Tallahassee garbage collections averaged 190 tons per day. Mr. Kleman understandably and correctly felt the City faced an emergency. Its businesses were beginning a week's trade with their garbage cans unemptied. Until the strike was ended garbage would be accumulating at a massive rate. By Tuesday, the second day of the strike, there was 380 tons of uncollected garbage in the City. Not only was the City responsible for collecting the garbage, it was bound by statute to end the illegal strike and under pressure to act quickly.

Tuesday a number of collectors, including all the Plaintiffs, again refused to work. Told to get off City property if they were not working, they assembled in a parking lot across the street from the sanitation facility. Truman Smith and Lindsey Ardley were with them. Read Westcott, Dan Kleman, Rhett Miller, Evelyn Brion, and Jim Blue were all inside the sanitation department offices. Read Westcott spoke to the collectors for the officials. Once again he told them their refusal to work was an illegal strike and they would be fired if they continued. The men said they would return to work if Truman Smith and Lindsey Ardley were reinstated and all collectors were given a raise. All the garbage collectors, including the Plaintiffs, understood their actions were illegal and they would be discharged if the work stoppage continued.

After consulting the others Dan Kleman rejected the garbage collectors' demands and sent Read Westcott to tell the collectors that they would be discharged unless they began working by 10:30 a. m. At 10:20 a. m. Read Westcott delivered the ultimatum: "You have ten minutes to get your asses on those trucks or go down to Personnel." All the Plaintiffs understood they would be discharged if they did not start working. The Plaintiffs and all but one of the group did not get on the trucks. Westcott told them they were discharged and to go down to the Personnel office to pick up their termination papers. When Mr. Westcott fired the Plaintiffs he did not give them written notice of their termination or its reasons, and he did not tell them of any rights to appeal the termination.

As they were instructed, the Plaintiffs trooped downtown to the Personnel office. There they were interviewed by an employee who asked them questions on an exit interview report form, recorded their answers, and then gave them the report to sign. Each Plaintiff signed a report. The forms indicate each Plaintiff left because he was dissatisfied. Rayfield Williams, Arthur Davis, Henry Smith, William Burgess, and Jessie Derico all specified inadequate pay as one cause of dissatisfaction. Truman Smith, Jessie Derico, and Rayfield Williams specified dissatisfaction with their supervisors. None of the Plaintiffs asked for a hearing on their dismissal.

Rhett Miller and Dan Kleman signed "Reports of Dismissal" for each of the Plaintiffs. Each form states the reason for dismissal was "Refusing to go to work" without further explanation. The report does not contain information about rights to appeal the termination. The Plaintiffs never received a copy of this report, although the distribution sequence printed on the corner indicates a copy should go to the employee.

When all this went on the City had a Personnel Policy and Procedure Manual which defined employee status, grievance procedures, and dischargeable offenses. That manual, when Plaintiffs were discharged, did not provide specifically for a right to a hearing on a dismissal. It did, however, provide grievance procedures. Although the policy was not written down, the City always allowed discharged employees to use the grievance procedure to dispute a dismissal if the employees requested a hearing. If the Plaintiffs had requested a hearing, under that policy they would have received one.

The Plaintiffs are not well educated. Many of them cannot read. All are, at best, marginally literate. Written communications would have been difficult if not impossible for them to comprehend.

## CONCLUSIONS OF LAW

### Rejected Defenses

The Defendants have raised several affirmative defenses which, if valid, would bar this action. Their defenses are not valid.

### Statute of Limitations

■ One defense raised is the special 12 month statute of limitations found in Chapter 18923, Section 1, Special Acts of Florida (1937), for actions against the City of Tallahassee. This defense must be rejected without even reaching the question of whether the individual Defendants can invoke the statute. State law governs the defense. *Board of Regents of the University of the State of New York v. Tomanio*, — U.S. —, 100 S.Ct. 1790, 64 L.Ed.2d 440 (1980). Florida's Constitution states: "There shall be no special law or general law of local application pertaining to . . conditions precedent to bringing any civil or criminal proceedings, or limitations of time therefor . . . ." Art. III, § 11(a)(7), Fla.Const. Applying the special act's statute of limitations is clearly prohibited by Florida's Constitution. *See, Wilson & Co. v. City of Jacksonville*, 170 F.2d 876 (5th Cir. 1948), and *Skinner v. City of Eustis*, 147 Fla. 22, 2 So.2d 116 (1941). Both apply Article III, Section 20, Florida Constitution (1885), which prohibited special or local laws "regulating the practice of courts of justice."

### Res Judicata

■ Before filing this action some of the Plaintiffs sued the Defendants in Leon County Circuit Court alleging the City could not terminate them without triggering a hearing before the Florida Public Employees Relations Commission. The Plaintiffs voluntarily dismissed their lawsuit. Defendants argue the disposition of that lawsuit is *res judicata* precluding recovery in this case.

Neither legal nor factual issues were resolved by the voluntary dismissal in Leon County Circuit Court; the action was not under Title 42, United States Code, Section 1983 (1976); and it was not a final judgment on the merits. "For a prior judgment to bar an action on the basis of res judicata, the prior judgment must have been rendered by a court of competent jurisdiction, there must have been a final judgment on the merits, and the same cause of action must be involved in both cases." *Hall v. Tower Land and Investment Co.*, 512 F.2d 481, 483 (5th Cir. 1975). These conditions are clearly not satisfied by the voluntary dismissal in Leon County Circuit Court. Defendants plea of bar by *res judicata* is meritless.

### The Plaintiffs' Claim

■ Establishing a right to recover under Section 1983 for denial of due process requires proving three elements. There must be a deprivation of some liberty or property interest. State action must have caused the deprivation. And the deprivation must have been worked without due process.

### Property Interest

■■ The first issue to resolve is whether the Plaintiffs had an interest protected by the due process clause. Surprisingly, this issue is where the Defendants have focused their most vigorous defense. "A person's interest in a benefit is a 'property' interest for due process purposes if there are such rules or mutually explicit understandings that support his claim of entitlement to the benefit and that he may invoke at a hearing." *Perry v. Sindermann*, 408 U.S. 593, 601, 92 S.Ct. 2694, 2699, 33 L.Ed.2d 570, 580 (1972). A person's property interest is determined by reference to state law. *United Steelworkers of America, AFL-CIO v. University of Alabama*, 599 F.2d 56 (5th Cir. 1979). Employment is the interest Plaintiffs claim is protected. Plaintiffs' rights and expectations about their employment were set out in The City of Tallahassee Personnel Policy and Procedure Manual [Manual]. Judge Stafford of this court ruled last year that the Manual created a property interest in employment with the City which was protected by the due proc-

ess clause. *Marion v. Barrier*, TCA 78–739 (Order of August 15, 1978). After considering all the portions of the handbook in evidence, *United Steelworkers of America, AFL-CIO, supra,* I reach the same conclusion as Judge Stafford.

Chapter 3(E)(22) of the Manual defines dismissal as "[c]omplete separation of any employee, for cause, from the employment of the City." A list of reasons for disciplinary action titled "Causes" set out in Chapter 3(Q)(4) of the Manual includes violations of the regulations, "inattention to duty," and "conduct below the standard which can reasonably be expected for the position held." Chapter 14, which deals specifically with discipline, again defines dismissal as "separation from City employment for cause." Ch. 14(A)(3), Manual. The Chapter goes on to elaborate upon the objective disciplinary standards for City employees. These definitions and standards clearly create a justified mutual expectation that once begun employment with the City will continue unless cause for discharge is given.[1] "City employment which allows termination only for cause creates a constitutionally protectable property interest." *Thurston v. Dekle*, 531 F.2d 1264, 1272 (5th Cir. 1976) (footnote omitted), *vacated and remanded,* 438 U.S. 901, 98 S.Ct. 3118, 57 L.Ed.2d 1144 (1978), *on remand,* 578 F.2d 1167 (5th Cir. 1978). The Plaintiffs had a constitutionally protectable property interest in their employment.

*Deprivation and State Action*

The Defendants have argued the Plaintiffs were not discharged. This is a question of fact. The City and its officials treated the separations as discharges for prohibited conduct until litigation began. Their pre-litigation position was correct. The evidence shows the Plaintiffs were discharged. Actions taken by the Defendants, the parties agree, were state action.

*Due Process*

The Plaintiffs say they were denied due process prior to termination claiming:

At no time prior to the time of the dismissals were the Plaintiffs given (1) a hearing, (2) before an impartial decision-maker after (3) notice of the charges (4) with an opportunity to present their own case.

Plaintiffs also claim nothing happened after their termination to remedy the alleged denial of due process. They rely heavily on the outline in *Thurston v. Dekle*, 531 F.2d 1264 (5th Cir. 1976), *vacated and remanded,* 438 U.S. 901, 98 S.Ct. 3118, 57 L.Ed.2d 1144 (1978), *on remand,* 578 F.2d 1167 (1978), of "the minimum pretermination procedural elements required by the due process clause of the Fourteenth Amendment." *Thurston v. Dekle*, 531 F.2d at 1273. The pretermination risk-reducing procedures set out were:

written notice of the reasons for termination and an effective opportunity to rebut those reasons. Effective rebuttal must give the employee the right to respond in writing to the charges made and to respond orally before the official charged with the responsibility of making the termination decision.

*Id.* (footnotes omitted). There is no denying the Plaintiffs were not given written notice of the reasons for their termination prior to termination. Neither were they given an opportunity to participate in a formally designated hearing. A conclusion that they were denied due process does not automatically follow.

*Thurston* notes that in extraordinary situations requiring the procedures set out would be improper. The Defendants here were faced with an extraordinary situation. Garbage was accumulating at the rate of one hundred and ninety tons a day. The Plaintiffs were flagrantly breaking the law of Florida. Immediate action was necessary. In the circumstances the oral communications between the Plaintiffs and Defendants provided sufficient pretermination due process for the situation.

Inquiry into the Plaintiffs' claims does not end with a determination that pretermination procedures in the extraordinary

---

1. This evaluation deals only with and is limited to discharges. Other forms of separation are individually addressed in the Manual and not involved here.

situation gave them sufficient pretermination due process. They allege that all process offered them before or after termination was constitutionally insufficient.

Due process is a frequently explained and vaguely defined term. The Supreme Court's statement in *Mathews v. Eldridge*, 424 U.S. 319 at 333, 96 S.Ct. 893 at 902, 47 L.Ed.2d 18 at 32 (1976), is representative. "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.' *Armstrong v. Manzo*, 380 U.S. 545, 552, 14 L.Ed.2d 62, 85 S.Ct. 1187 (1965)." *See, also, Barry v. Barchi*, 443 U.S. 55, 65, 99 S.Ct. 2642, 2649, 61 L.Ed.2d 365, 376 (1979); *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). The Fifth Circuit frankly describes the due process clause as "the elusive Fourteenth Amendment proscription on denial of 'property' without due process of law." *Roane v. Callisburg Independent School District*, 511 F.2d 633, 635 (5th Cir. 1975). Each case turns almost entirely upon its facts.

> [R]ecognition that a leading case may be relevant does not resolve the dispute. Small variations and nuances of fact may distinguish present cases from established precedent.

*Id.* at 636.

■ There are no rigid formulas or procedures established. But certain policies, goals, and analyses have been delineated. Due process is flexible. *Smith v. Organization of Foster Families for Equality and Reform*, 431 U.S. 816, 848, 97 S.Ct. 2094, 2111, 53 L.Ed.2d 14, 38 (1977); *Hortonville Joint School District No. 1 v. Hortonville Education Association*, 426 U.S. 482, 494, 96 S.Ct. 2308, 2315, 49 L.Ed.2d 1, 10 (1976); *Craig v. Carson*, 449 F.Supp. 385, 391 (M.D. Fla. 1978). Determining the process due in a particular situation is a weighing process. *Board of Regents v. Roth*, 408 U.S. 564, 570, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548, 557 (1972). The importance of the facts in each case leaves "much play in the joints" of due process. *Wolff v. McDonnell*, 418 U.S. 539, 558, 94 S.Ct. 2963,

2975, 41 L.Ed.2d 935, 952 (1974). Only the constitutional minimum is guaranteed. And that minimum is any reasonable procedure appropriate to the circumstances which fairly protects an individual from arbitrary action. *Smith v. Organization of Foster Families for Equality and Reform*, 431 U.S. 816, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977); *Ingraham v. Wright*, 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977); *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976); *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); *Mullane v. Central Hanover Bank and Trust Co.*, 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950); *Glenn v. Newman*, 614 F.2d 467 (5th Cir. 1980); *Ferguson v. Thomas*, 430 F.2d 852 (5th Cir. 1970).

■ Ultimately, the judicial pronouncements on due process and its meaning convey the directive that procedures should be fundamentally fair. Useful guidance comes from the sparse basic requirements, the analytical framework articulated and implementation of these. The only universal requirement is that a person receive notice and an opportunity to be heard. In judging the sufficiency of the process offered three factors must be considered and balanced. They are:

(1) "the private interest that will be affected by the official action,"

(2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards," and

(3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."

*Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18, 33 (1976).

Keeping in mind "that the interpretation and application of the Due Process Clause are intensely practical matters"[2], I now consider the firing of the garbage collectors

---

2. *Goss v. Lopez*, 419 U.S. 565, 578, 95 S.Ct. 729, 738, 42 L.Ed.2d 725, 737 (1975).

and whether they received due process. The first factor, the private interest affected, is easily evaluated. Their livelihood is the interest affected. Its importance is undeniable and obvious. *See e. g., Arnett v. Kennedy,* 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974); *Glenn v. Newman,* 614 F.2d 467 (5th Cir. 1980). Its importance can be placed on a decisional continuum. Although important, a job is not as important as an innocent person's loss of liberty, which is an interest calling for the most stringent due process protections. *Pointer v. Texas,* 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). Employment is also not as crucial a private interest as welfare benefits. *See, Arnett v. Kennedy,* 416 U.S. 134, 169, 94 S.Ct. 1633, 1651, 40 L.Ed.2d 15, 42 (1974); *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). The interest therefore calls for less than the full panoply of protections offered in criminal trials. It also requires less than the procedures in *Goldberg v. Kelly, supra,* which included a pretermination hearing; adequate, timely notice of the reasons for the proposed termination; an opportunity to confront witnesses, present evidence, present argument; and the right to be represented by counsel. Just what is required must be determined by considering the other two factors.

Reserving consideration of the second factor, I turn next to the third factor, the Government's interest. "[T]he Government's interest in being able to act expeditiously to remove an unsatisfactory employee is substantial." *Arnett v. Kennedy,* 416 U.S. 134, 168, 94 S.Ct. 1633, 1651, 40 L.Ed.2d 15, 41 (1974) (Powell, J., concurring). *See, also, Thurston v. Dekle,* 531 F.2d 1264 (5th Cir. 1976), *vacated and remanded,* 438 U.S. 901, 98 S.Ct. 3118, 57 L.Ed.2d 1144 (1978), *on remand,* 578 F.2d 1167 (5th Cir. 1978). This interest is in this case extraordinarily strong. At least 19 people were involved. Additional procedures would have been time consuming and expensive. The situation had already consumed a great deal of the City Manager's time as well as that of several other City officials. A practical problem amounting to an emergency existed. In addition to violating the rules governing their employment and refusing to work, the Plaintiffs were breaking the law.[3] The City had to resolve the problem. PERC was pressuring the City to act soon or PERC would use its statutory authority to break in. All these facts made the usual government interest in swift, efficient administrative action even more compelling. At the very least the government's interest was equal to the individual interest. It is even fair to say it outweighed the individual interest.

Determining the Government's interest most weighty does not end the inquiry nor obviate the need for due process. The central question remains: What nature of hearing is appropriate? In this case evaluation of the second factor will be determinative. The second factor is the risk of an erroneous determination and the probable value, if any, of additional or substitute safeguards. To evaluate the risk of error, the purpose for and the decisions made in a hearing must be identified. Hearings are primarily for determining facts. Reasons given for requiring hearings demonstrate this, as does the structure of hearings. For example, in *Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975), the Court required an informal hearing before suspending a student from school. Its major concern was preventing error in determining facts:

> The concern would be mostly academic if the disciplinary process were a totally accurate, unerring process, never mistaken and never unfair. Unfortunately, that is not the case, and no one suggests that it is. Disciplinarians, although proceeding in utmost good faith, frequently act on the reports and advice of others; and the controlling facts and the nature of the conduct under challenge are often disputed. The risk of error is not at all trivial, and it should be guarded against if that may be done without prohibitive cost or interference with the educational process.

**3.** Florida prohibits public employee strikes. § 447.505, Fla.Stat. (1977).

*Goss v. Lopez,* 419 U.S. 565, 579, 580, 95 S.Ct. 729, 739, 42 L.Ed.2d 725, 738 (1975). *See, also, Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) (prison discipline case; one function of notice is to give chance to marshal facts). *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), emphasizes the starring role fact finding plays in the hearing requirement: "In almost every setting where important decisions turn on questions of fact, due process requires an opportunity to confront and cross-examine adverse witnesses." *Goldberg, supra,* 397 U.S. at 269, 90 S.Ct. at 1021, 25 L.Ed.2d at 300. Justice White articulates due process's focus on fact finding in his dissent in *Ingraham v. Wright,* 430 U.S. 651, 692, 97 S.Ct. 1401, 1423, 51 L.Ed.2d 711, 743.

The reason that the Constitution requires a State to provide 'due process of law' when it punishes an individual for misconduct is to protect the individual from erroneous or mistaken punishment that the State would not have inflicted had it found the facts in a more reliable way.

The risk of factual error is central to weighing the risk of error. Whether a garbage collector refused to work was the only significant factual question in this case. The proceedings which occurred left no room for error on that fact. Read Westcott and Rhett Miller both knew the garbage collectors on sight and observed them refusing to work. Dan Kleman saw the group assembled Monday and Tuesday. That none of the garbage trucks left was an undisputable fact. None of the Plaintiffs' time sheets were marked for the two days. All these factors showed rather conclusively at the time that the Plaintiffs were refusing to work. One last fact makes the fact-finding process followed virtually foolproof. If some garbage collector had been absent for some reason other than the work stoppage, he or she would not have received the instruction on April 11 to report to the Personnel Office and therefore been conclusively identified by his or her own action of reporting to Personnel.

When the risk of factual error is minimal, the need for a formal hearing is minimized. *Ingraham v. Wright,* 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977), teaches that. Protection from corporal punishment was the private interest involved in *Ingraham.* The Court considered it a weighty interest. But due process did not require an official hearing "because paddlings are usually inflicted in response to conduct directly observed by teachers in their presence, the risk that a child will be paddled without cause is typically insignificant." *Ingraham v. Wright,* 430 U.S. at 677, 97 S.Ct. at 1416, 51 L.Ed.2d at 734. The situation is much the same here. City Manager Kleman terminated the Plaintiffs for an offense committed in his presence. The risk of error was insignificant.

A lesser part of fact finding is presenting the various conclusions which can be drawn from the evidence. Offering interpretations is one function of the opportunity to be heard. In this case, however, there were no competing theories. The evidence was simple and direct. Most of it was personally observed by the decision maker. The facts were clear. Any further proceedings would have been time-consuming, costly, icing on a plain vanilla cake.

A chance to argue the appropriateness of sanctions leveled is a secondary function of an opportunity to be heard. *See e. g., Gagnon v. Scarpelli,* 411 U.S. 778, 785, 93 S.Ct. 1756, 1761, 36 L.Ed.2d 656, 663 (1973). In this case that function was sufficiently served. The prohibited conduct was outlawed by statute and the rules governing the Plaintiffs' employment. Mr. Kleman knew he and his staff had told the Plaintiffs time and time again refusing to work was prohibited and would cause their discharge. As long as Plaintiffs were striking, Florida law prohibited Kleman from taking the actions Plaintiffs demanded. § 447.-507(5), Fla.Stat. (1977). Kleman was quite patient. He did not fire the Plaintiffs the first day they struck. The second day he waited over four hours after the Plaintiffs

were to start work before finally discharging them. The standards involved were clear to the Plaintiffs. They knew which acts were prohibited. And the consequences were clear. There were no subtleties to argue. Every benefit of doubt was given the garbage collectors. Mr. Kleman's decision was based solidly upon the facts and carefully considered. The risk of error in this case was negligible. There was no value to any further proceedings.

The fact of the matter is the Plaintiffs received notice and a hearing. In some ways their hearing was exemplary. It was not post-termination. It was not pre-termination. It was pre-terminable act. The rules were plain and carefully set out. Plaintiffs' arguments were considered, discussed, and rejected with an explanation. When the Plaintiffs refused to work they were given a second chance and a third chance.

True, the Plaintiffs were not given something formally titled a hearing. But the absence of lawyerly labels cannot be used to deny the existence of due process anymore than a pretext of a hearing can be used to conceal a denial of due process.

The reality is that the Plaintiffs received all the process they were due. They have not proven their claim.

### Good Faith Immunity

The Defendants claim a qualified immunity as a defense if a constitution deprivation was proved. I have concluded there was no constitutional deprivation. Had there been one, Defendants Miller and Kleman would be protected by it. Their qualified immunity, however, is no longer available to the City. *Owen v. City of Independence, Missouri,* —— U.S. ——, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980).

An executive's qualified immunity is established when the evidence shows the official acted sincerely with a belief he or she was doing right and that the belief was reasonable. *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975); *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Laverne v. Corning,* 522 F.2d 1144 (2d Cir. 1975). Both individual Defendants met that test.

Throughout the events preceding the strike and the strike, Kleman and Miller sought and followed their attorneys' advice. This action has been specifically identified as evidence supporting finding immunity. *See e. g., Skehan v. Board of Trustees of Bloomsburg State College,* 538 F.2d 53 (3d Cir. 1976), *cert. den.,* 429 U.S. 979, 97 S.Ct. 490, 50 L.Ed.2d 588 (1976). Good faith is also shown by the officials' meetings with the garbage collectors and the opportunities Plaintiffs were given to abandon their protest without punishment.

The Defendants' reliance upon counsel's advice alone established the reasonableness of their belief they were doing right. Cases Plaintiffs cite as controlling demonstrate the law relied upon could not reasonably be expected to have come to the City officials' attention. *Thurston v. Dekle,* 531 F.2d 1264 (5th Cir. 1976), and *Bogard v. Cook,* 586 F.2d 399 (5th Cir. 1978), are the two cases. *Bogard* was issued over four months after the Plaintiffs were fired. *Thurston* was under consideration by the United States Supreme Court. Neither then could be called settled law in April of 1978.

The Clerk shall enter a judgment for the Defendants. Defendants' demand for attorney's fees is denied. Judgment shall be entered for the Plaintiffs on that issue.