608 So.2d 865 (1992)
K.M.T., Appellant,
v.
DEPARTMENT OF HEALTH AND REHABILITATIVE SERVICES, Appellee.
No. 91-2622.
District Court of Appeal of Florida, First District.
October 22, 1992.
*867 Neil H. Butler, Tallahassee, for appellant.
John R. Perry, Asst. District Legal Counsel, Dept. of Health and Rehabilitative Services, Dist. 2, Tallahassee, for appellee.
PER CURIAM.
K.M.T. appeals a final order of the Department of Health and Rehabilitative Services (HRS) denying her motion to expunge her name from the elderly abuse registry. She contends that the order must be reversed because the 1989 version of the Adult Protective Services Act (the Act), sections 415.101-415.113, Florida Statutes (1989), under which she was found to be a perpetrator of neglect, violates federal and state constitutional due process requirements. Alternatively, she contends that the order must be reversed because the hearing officer misconstrued the requirements of the Act with regard to what constitutes neglect under section 415.102(13), Florida Statutes (1989), and, as a result, held HRS to an incorrect burden of proof.
We reverse for the following reasons. Classifying the report against Appellant as "confirmed," which resulted in the termination of her employment, before giving her notice and an opportunity to be heard on the matter, constituted a denial of procedural due process. Moreover, the department failed to prove neglect on the part of Appellant.

I.
The final order was predicated on the following findings of fact made by the hearing officer. K.M.T. was employed as a certified nursing assistant (CNA) by Centerville Care Center (Centerville) to perform services in its nursing home, and her employment extended from May 1989 through February 1990. During this period, her superiors rated her "above average." Prior to working for Centerville, K.M.T. had worked in other nursing homes for approximately 12 years. Her regular duties as a CNA at Centerville consisted of providing basic care for the nursing home patients, including assisting them with their activities of daily living, such as feeding, bathing, dressing, and ambulation. Appellant's rotating duties also included assisting in the restorative dining room.
Restorative dining is a program at Centerville in which patients who have partially or completely lost the ability to feed themselves, or who may need careful observation due to swallowing problems, may be closely observed and re-taught feeding skills. A rehabilitation and restorative assistant (RRA) is assigned to the evening meal in the restorative dining room, and is assisted by two CNA's who serve on a rotational basis.
On February 9, 1990, K.M.T. and Willie Radder were the CNA's and Frances Whittaker was the RRA assigned to the restorative dining room. Whittaker, Radder, and K.M.T. had each been assigned to the restorative dining room before and were familiar *868 with its purpose, procedures, and atmosphere. The standard operating procedure of the dining room was as follows. Patients usually were assisted by CNA's from their respective patient care areas into the dining room while members of the kitchen staff brought in the food cart. Patients who could feed themselves were served first, after which the RRA and CNA's served the other patients and assisted in feeding them. Patients who could do so were permitted to return to their rooms by themselves. Many patients, however, required assistance, which was provided by the CNA's assigned to the dining room. One CNA would take a patient to his or her room and return immediately, while the other CNA remained in the dining room with the other patients. There was no established schedule for the return of patients to their rooms, and the CNA available at a given time assisted the returning patient. If two CNA's were needed to escort a patient, the RRA was still available to care for the patients remaining in the dining room, but all three staff members should not simultaneously be away from the restorative dining room so long as any patients remained there. The RRA and CNA's were responsible for removing the trays and returning the food cart to the kitchen, and for sweeping or blotting up the floor after the last patient left the restorative dining room. All activities were intentionally staggered so that patients would not be left alone. Centerville never committed this policy to writing, but Whittaker, Radder, and K.M.T. understood that at least one staff member should be present in the restorative dining room at all times when a patient was there.
On February 9, 1990, Whittaker, the RRA assigned to the restorative dining room, clocked out of Centerville at 6:30 p.m., having received prior permission from her superior, the Director of Nursing, to leave early. Before leaving, she informed Radder and K.M.T. that they would have to supervise the patients in the dining room without her. At this point, three patients remained in the dining room. One of these patients, L.B., could walk only 10 to 15 feet with a walker and human assistance, could not carry on a coherent conversation, and functionally was wheelchair bound. Radder took another patient back to her room, leaving K.M.T. alone in the dining room with L.B. and the remaining patient. Radder's return to the dining room was delayed several minutes because she was asked to assist with some other patients. When she returned, she observed that the remaining two patients were unattended. One was still properly seated at a table, but L.B. was lying on the floor trying to get up. Help was summoned and medical attention was given to L.B., who did not suffer any substantial physical harm. K.M.T. was paged two or three times before she appeared in the dining room. Approximately 3 to 5 minutes elapsed from the time Radder returned to the dining room until K.M.T. reappeared. K.M.T. testified that, in the absence of both Whittaker and Radder, she voluntarily left L.B. and the other patient alone in the dining room to return the trays and food cart to the kitchen. When she returned, both patients were still alone but all right. K.M.T. then left the dining room and advised the chief nursing assistant and some CNA's she thought were going to get both patients that she was finished in the restorative dining room; she stated that she needed to put some power steering fluid in her car and would be gone only a few minutes. K.M.T. then went to the parking lot and put the fluid in her car. She returned approximately 8 to 10 minutes later, heard the page for her, and learned that L.B. had fallen in the restorative dining room.
HRS investigated this February 9 incident and classified it under the 1989 version of Chapter 415, the Adult Protective Services Act. On March 10, 1990, HRS closed its investigation, confirmed that K.M.T. was a perpetrator of neglect of an aged person (L.B.), and placed K.M.T.'s name on the central abuse registry. Centerville reacted by firing K.M.T.K.M.T.'s request that HRS expunge the report was denied. K.M.T. then filed a request for a section 120.57 administrative hearing, and a hearing was held on March 18, 1991.
*869 In the conclusions of law, the hearing officer rejected K.M.T.'s attack on the constitutionality of chapter 415, Florida Statutes (1989), because such issues are within the exclusive jurisdiction of courts established under Article V of the Florida Constitution. She found that HRS had proved by a preponderance of the evidence that K.M.T. was a perpetrator of "neglect," as defined in section 415.102(13), Florida Statutes (1989), and recommended that K.M.T.'s request for expunction be denied. The Secretary of HRS rejected K.M.T.'s exceptions to the recommended order and entered a final order denying K.M.T.'s request for expunction, adopting without change the findings of fact and conclusions of law in the recommended order.

II.
K.M.T. argues that the 1989 version of the Act is unconstitutional because it denies due process to those persons accused of abuse or neglect of an aged person or disabled adult. According to K.M.T.'s argument, the procedure set out in the Act as it read in 1989 involves: (1) accusation, (2) investigation, (3) conviction and imposition of the penalty, and then (4) the trial. K.M.T. argues that because "conviction and imposition of the penalty" occur prior to trial, this procedure amounts to an unconstitutional deprivation of due process.
The United States Supreme Court has described the right to pursue one's chosen career as a liberty interest protected by the Due Process Clause. See Meyer v. Nebraska, 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923) ("liberty" denotes the freedom to engage in any of the occupations of life). The Florida Supreme Court has described this right as both a property interest and a liberty interest protected by the Due Process Clause. See State v. Ives, 123 Fla. 401, 167 So. 394, 399 (1936) ("[T]he truth must not be ignored that a citizen's right to pursue any lawful business is `property' and the right to contract for personal services as a means for the acquisition of property is one of the privileges of a citizen of the United States of which he cannot be deprived without invading his right of liberty."). These cases make clear that the Due Process Clause protects K.M.T.'s interest in pursuing her career as a CNA in the geriatric health care field.
K.M.T. argues that HRS deprived her of this protected interest without due process by classifying the report that she was a perpetrator of neglect as "confirmed" and immediately placing her name in the central abuse registry before affording her a hearing. She argues that as a result of HRS's confirmation of the report and placement of her name in the abuse registry, Centerville terminated her employment. HRS responds that its compliance with its statutory duty under section 415.103(3), Florida Statutes (1989), to classify the report as "confirmed" and report its findings to the central abuse registry did not cause K.M.T. to be discharged from her employment with Centerville. HRS further argues that it did not deprive K.M.T. of any protected interest because an individual whose name is placed on the central abuse registry is not disqualified from employment on that basis until after the report has been "judicially determined" in a chapter 120 proceeding.
We reject HRS's contention that its actions confirming the report against K.M.T. and reporting this to the central abuse registry did not cause Centerville to discharge K.M.T. from her job as being contrary to the hearing officer's finding of fact that Centerville reacted to HRS's confirmation report and placement of K.M.T.'s name in the central abuse registry by firing K.M.T.[1] Since the HRS final order adopted *870 and incorporated the findings of fact contained in the recommended order, HRS is precluded from maintaining on this appeal that its confirmation of the report and placement of K.M.T.'s name in the central abuse registry did not cause her to be fired.
HRS does not point to, and our review of the Adult Protective Services Act as it existed in 1989 when this proceeding was under consideration does not reveal, any requirement that a confirmed report of neglect be "judicially determined" before the alleged perpetrator may be disqualified from employment on the basis of the confirmed report. Rather, subsection 415.103(3)(d)3.b., Florida Statutes (1989), states without qualification that:
The alleged perpetrator of a confirmed report may be disqualified from working with children or the developmentally disabled or from working in sensitive positions involving the care of children, the developmentally disabled, disabled adults, or aged persons.
(Emphasis added.) This statute does not state that judicial determination is a prerequisite to its application, and this record does not indicate that such determination was made before K.M.T.'s name was placed in the register. K.M.T. correctly points out that HRS's argument on this point is contrary to the testimony of the Director of the Florida Protective Services System, B.J. Cosson, that the statutory prohibition from employment attached when the alleged perpetrator's name was logged in the abuse registry. It is clear that HRS's actions in classifying the report against K.M.T. as "confirmed" and placing her name in the abuse registry caused her to be fired and thereby deprived her of an interest that is protected by the Due Process Clause.
Having determined that K.M.T. has been deprived of a right or interest protected by the Due Process Clause, our analysis now turns to the requirements of due process under these circumstances and whether HRS afforded K.M.T. due process. See Cleveland Board of Education v. Loudermill, 470 U.S. 532, 542, 105 S.Ct. 1487, 1493, 84 L.Ed.2d 494 (1985); Burgess v. Miller, 492 F. Supp. 1284 (N.D.Fla. 1980). The Due Process Clause requires that an individual not be deprived of life, liberty, or property without prior notice and an opportunity for a hearing appropriate to the nature of the case. Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 313, 70 S.Ct. 652, 656, 94 L.Ed. 865 (1950). The "root requirement" of the Due Process Clause is that an individual must be "given an opportunity for a hearing before he is deprived of any significant property interest." Cleveland Board of Education v. Loudermill, 470 U.S. 532, 542, 105 S.Ct. 1487, 1493, 84 L.Ed.2d 494 (1985) (emphasis in original). Although in limited situations a post-deprivation hearing will satisfy due process requirements, see Mathews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (hearing after termination of Social Security disability benefit payments complies with due process where the claimant has an effective process for asserting his claim prior to any administrative action and has the right to an evidentiary hearing and subsequent judicial review prior to the claim denial becoming final), the United States Supreme Court has indicated that, "absent `the necessity of quick action by the State or the impracticality of providing any predeprivation process,'" a post-deprivation hearing would be constitutionally inadequate. Logan v. Zimmerman Brush Co., 455 U.S. 422, 436, 102 S.Ct. 1148, 1158, 71 L.Ed.2d 265 (1982). See also Fetner v. City of Roanoke, 813 F.2d 1183 (11th Cir.1987) ("Post-deprivation remedies do not provide due process if predeprivation remedies are practicable.").
Section 415.103(3)(c), Florida Statutes (1989), provided that, upon completion of the investigation of a report, it should be *871 classified either as "confirmed," "indicated," or "unfounded," and that the alleged perpetrator should be notified of the classification and the right to ask for an amendment or expunction of the record. This subsection also provided that "[c]omputer records of a confirmed report shall be retained for 50 years from the receipt date of the report." The language of section 415.103 in 1989 required that the information relating to a confirmed report be entered in the abuse registry before the alleged perpetrator had the opportunity to contest such report (otherwise, the alleged perpetrator would not be given the opportunity to request that the report be "expunged from the central abuse registry and tracking system").[2] HRS has not set forth any logical reason why the classification of a report as confirmed must necessarily be entered in the abuse registry before the alleged perpetrator has the opportunity for a hearing to contest such classification. Moreover, the 1990 amendment to the Act, ch. 306, § 45, Laws of Florida, shows that giving the alleged perpetrator the opportunity for a prior hearing at which he can contest the classification of "confirmed" outweighs any state necessity for quick action or any impracticality of providing a pre-classification hearing.[3]See §§ 415.103(3)(c)2, 415.104(2), Fla. Stat. (1990 Supp.). We hold, therefore, that K.M.T. was deprived of procedural due process under these circumstances.
We find it unnecessary to decide whether the 1989 version of the statute is facially unconstitutional, however. We base this conclusion on the fact that the statutory authority for such pre-hearing sanction, Section 415.103(3), Florida Statutes (1989), no longer existed at the time of the final hearing, and we follow the basic principle of jurisprudence that courts will only consider the constitutionality of a statute if the case cannot be resolved on any other basis. See, e.g., Sandlin v. Criminal Justice Standards & Training Comm'n, 531 So.2d 1344, 1346 (Fla. 1988); Singletary v. State, 322 So.2d 551, 552 (Fla. 1975); McKibben v. Mallory, 293 So.2d 48, 51 (Fla. 1974).
The 1989 version of section 415.103(3) authorized an employer to terminate the employment of an employee, such as Appellant, who was merely alleged to have perpetrated a confirmed report of abuse or neglect. The incident in this case occurred on February 9, 1990; HRS closed its investigation March 10, 1990, confirming that K.M.T. had neglected L.B. and placing K.M.T.'s name on the abuse registry (the facts which gave rise to Appellant's termination from employment); and by letter dated June 6, 1990, HRS refused to expunge K.M.T.'s name from the abuse registry. On or about August 1, 1990, the amended version of section 415.103 took effect, which eliminated the pre-hearing termination penalty of subsection (3). Ch. 90-306, §§ 45, 78, Laws of Fla. K.M.T.'s final hearing was held on March 18, 1991.
If a statute imposing a penalty in a civil action is repealed or modified during the pendency of the action, thereby eliminating the penalty, such penalty no longer has any force or effect on the action. Pensacola & A.R. Co. v. State, 45 Fla. 86, 33 So. 985 (1903) (when statute authorizing civil penalty against railroad company for *872 collecting fares above permitted rate was repealed after judgment but during pendency of appeal, such provision could no longer apply to pending action); Navarro v. Barnett Bank of W. Fla., 543 So.2d 304 (Fla. 1st DCA 1989) (because statute that required sheriff or deputy who failed to execute process to pay $100 to aggrieved party was repealed after plaintiff was injured but before suit was filed, penalty could not be enforced); Fogg v. Southeast Bank, N.A., 473 So.2d 1352 (Fla. 4th DCA 1985) (balloon mortgage statute that was amended to exempt mortgages over $500,000 from forfeiture provision applied to pending foreclosure action, although mortgage had been executed prior to amendment); Gewant v. Florida Real Estate Comm'n, 166 So.2d 230 (Fla. 3d DCA 1964) (because statute authorizing Real Estate Commission to suspend registration of broker for statutory violation was repealed during pendency of proceedings against broker, Commission was precluded from penalizing broker). As stated by the Fourth District, "A statute which eliminates a penalty applies, from the moment it takes effect, to all pending proceedings." Fogg, 473 So.2d at 1355.
We conclude, therefore, that the amendment and elimination of the employment-termination provision of the 1989 version of section 415.103(3) removed such provision from the case at bar altogether, meaning that the penalty could not be imposed on K.M.T. under this statute. This conclusion renders moot the necessity of our considering the constitutionality of the challenged statutory requirement.

III.
K.M.T. also argues on appeal that the final order should be reversed because the hearing officer misconstrued the requirements of the Act with regard to what constitutes neglect under section 415.102(13), Florida Statutes (1989), and, as a result, held HRS to an incorrect burden of proof. The following conclusions of law contained in the recommended order and adopted by the final order are pertinent to this issue:
6. Although employment policies of a single private facility cannot dictate a legal standard of neglect, they may be one of several indicators of what reasonably prudent nursing should entail. K.M.T.'s prior nursing experience or, under the circumstances, even the common sense of an ordinarily prudent person, which is the collective wisdom of our shared human experience, should have told K.M.T. that no restorative dining room patient should be there left alone [sic]. This is particularly so since K.M.T. knew in the first place that these patients had been assigned to the restorative dining room to prevent potential falls and choking. At a minimum, K.M.T. had to know that Ms. F. needed help to feed herself and that L.B. was uncommunicative and unsteady on her feet.
* * * * * *
11. This is not a case of mere inadvertence, but it also is not a case of evil intent... . This is a case of simple negligence (neglect) which, in a license discipline case, would probably result only in a reprimand, fine, or temporary suspension of K.M.T. from nursing practice, or which, in a civil action, could result solely in an award of money damages to L.B. However, in the context of Chapter 415 F.S., a determination of neglect will result in K.M.T. being barred from all employment positions of special trust and, in essence, blacklisted from her profession unless and until K.M.T. successfully proves her right to an exemption under Section 400.497(c), F.S.

Section 415.102(13), Florida Statutes (1989), defines "neglect" as follows:
"Neglect" means the failure or omission on the part of the caregiver ... to provide the care and services necessary to maintain the physical and mental health of an aged person or disabled adult, including, but not limited to, food, clothing, medicine, shelter, supervision, and medical services, that a prudent person would deem essential for the *873 well-being of an aged person or disabled adult.

(Emphasis added.)
Under section 415.103(3)(d)5, Florida Statutes (1989), HRS had the burden of proving by a preponderance of the evidence that K.M.T. committed the alleged neglect. In order to prove that K.M.T.'s act of briefly leaving L.B. unattended in the restorative dining room met the statutory definition of neglect,[4] HRS had to prove that continuous supervision of aged persons or disabled adults present in restorative dining rooms is essential to their well-being. The only evidence presented by HRS on this issue was Centerville's "tacitly understood" policy that at least one staff member had to be present in the restorative dining room at all times when even one patient was present in the dining room. HRS presented no agency rule stating that aged persons and disabled adults may not be left unattended for a few minutes in a nursing home's restorative dining room, and there was no expert testimony that Centerville's "tacitly understood" policy was a generally-accepted standard within the nursing home industry.[5] Even the hearing officer recognized that "the employment polic[y] of a single private facility cannot dictate a legal standard of neglect... ." Lacking proof of an objective standard, the hearing officer relied on "the common sense of an ordinarily prudent person, which is the collective wisdom of our shared human experience," and concluded that "no restorative dining room patient should be there [sic] left alone."
The purely subjective standard the hearing officer created and applied in this case does not constitute a sufficient standard for determining whether an individual's acts or omissions constitute neglect within the meaning of the Act. Rather, the acts or omissions must be judged against an objective standard, which may be defined by rule or by proof of general acceptance within the nursing home industry. Of course, HRS has the burden of proving that the alleged perpetrator's conduct fell below that standard. Because HRS failed to prove that K.M.T.'s single act of briefly leaving L.B. unattended in the restorative dining room constituted neglect as defined by section 415.102(13), the confirmation of neglect must be reversed.
This determination makes it unnecessary for us to reach K.M.T.'s argument that HRS failed to prove that L.B. was an "aged person" as stated in the investigative report.
The agency order is reversed with directions to expunge Appellant's name from the abuse registry.
REVERSED AND REMANDED.
ERVIN and ZEHMER, JJ., concur.
BOOTH, J., dissents.
NOTES
[1] The order addressed this issue in the following recitation:

26. This incident was investigated and classified by HRS under the 1989 version of Chapter 415 F.S. That statute was amended in 1990. There is no evidence that the classification of this registry entry was amended by HRS pursuant to any amendments during the period of time K.M.T. has been listed. K.M.T. was confirmed as a perpetrator of neglect of an aged person (L.B.) and placed on the Central Abuse Registry on March 10, 1990. Centerville Care Center reacted by firing K.M.T. Although the placing of K.M.T. on the Central Abuse Registry as a confirmed perpetrator preceded any written notice to K.M.T. and also preceded any opportunity for an evidentiary hearing to determine the correctness of HRS' classification, the instant proceeding before the Division of Administrative Hearings, pursuant to Section 120.57(1), F.S., has constituted that due process hearing.
(R. 89-90) (emphasis added).
[2] Mr. Cosson's testimony confirmed that this was the procedure being followed at this time:

Q. So notification to the alleged perpetrator and being put on the abuse registry are simultaneous events?
A. There's a day lag. Once the data is confirmed, then the letter is generated.
Q. So actually the logging on the abuse registry actually precedes the written notification?
A. That's correct.
Q. But the statutory prohibition for employment or the statutory directive to discharge attaches because they go on the abuse registry?
A. That's correct.
Q. Now, at the time they go on the abuse registry, that occurs before that person has the opportunity to have a hearing.
A. That's correct.
(T. 154-159).
[3] Sections 415.103(3)(c)2 and 415.104(2), Florida Statutes (1990 Supp.), provide that a report shall not be classified as confirmed until HRS has received a final administrative order rendered in a chapter 120 hearing or until the 30-day period provided to the alleged perpetrator for requesting such hearing has expired.
[4] The hearing officer found that K.M.T. returned to the facility approximately 8-10 minutes after leaving, and that Willie Radder returned to the restorative dining room 3-5 minutes before K.M.T. returned. (R. 86-87). Thus, the period of time during which L.B. was left unattended was, at most, 7 minutes.
[5] See McDonald v. Dept. of Professional Regulation, 582 So.2d 660 (Fla. 1st DCA 1991) (Zehmer, J., concurring) ("Whether McDonald's conduct deviated from the standards of care required of a licensed pilot under the cited statutory provision can be proved only through expert testimony establishing the requisite professional standards he is said to have violated. ..." (emphasis added)).