582 So.2d 660 (1991)
George H. McDONALD, Appellant,
v.
DEPARTMENT OF PROFESSIONAL REGULATION, BOARD OF PILOT COMMISSIONERS, Appellee.
No. 89-246.
District Court of Appeal of Florida, First District.
June 13, 1991.
*661 Earl R. McMillin, Cape Canaveral, for appellant.
Lisa S. Nelson, H. Reynolds Sampson, Charles F. Tunnicliff and Kenneth E. Easley, Dept. of Professional Regulation, Tallahassee, for appellee.
ERVIN, Judge.
Appellant, George McDonald, a licensed harbor pilot, appeals from a final order of the Department of Professional Regulation (DPR), Board of Pilot Commissioners (Board), assessing a $500 fine for appellant's negligence in allowing the stern of the vessel he was piloting to be towed into the bank of the channel. Because the Board erroneously applied an evidentiary presumption in order to prove negligence on the part of McDonald, we reverse and remand for further proceedings.
On October 29, 1986, appellant undertook to pilot the Kalliope II, a Liberian flag vessel, from the Port of Tampa, where it was docked, out to Tampa Bay. The vessel is 584 feet in length, and, at the time of its departure, had a maximum draft (depth of the keel below the water line) of 34 feet 9.7 inches. The ship was docked bow (front) in with its starboard (right) side to the dock at berth 223.
In order to pilot the vessel out to sea, it was necessary for it to be backed out of its berth while the stern (rear) of the ship was pulled toward the north. As the channel was only 400 feet wide, the maneuvering of the ship was a difficult task, however, two tugs assisted in the undocking, one on the port (left) side and one at the stern. Captain McDonald chose not to use the ship's own engines or steering during the undocking, because of the deep draft. Twice during the undocking, the captain of the tug pulling the stern of the Kalliope warned McDonald that the ship appeared to be getting too close to the Davis Island seawall, which is located on the west side of the channel. When the Kalliope II was aligned in the channel heading south, appellant for the first time ordered the engines ahead slow. Almost immediately problems were detected with the steering mechanism and shortly afterward the steering failed completely. Tugs were called and the Kalliope was again docked.
Underwater divers surveyed the vessel and found heavy damage to the ship's rudder. The trailing edge of the rudder was bent toward the starboard and there were horizontal streaks of clay on the lower edge of the port side of the rudder, indicating that the rudder had been struck on the port side. Examination of the steering gear inside the steering compartment revealed that the steering equipment had been seriously damaged and was inoperable. The damage to both the rudder and the steering equipment was consistent with damage that would be expected if a ship struck the edge of the channel with its rudder while backing.
Divers searched the west side of the channel in the vicinity of berth 223 and discovered an impact area approximately forty feet long parallel to the channel with clay substrata welled upwards, giving the appearance that the embankment had been struck by a large, heavy force. This impression was found outside the channel proper at a depth of approximately twenty-two feet at low tide. The clay substrata found in the impression was consistent with the streaks of mud found on the rudder.
On November 5, 1986, McDonald filed a marine casualty report with the Board, indicating that he had experienced a steering gear malfunction while piloting the ship. McDonald reported that at no time did he feel that the ship was grounded or that it had struck any object that could have contributed to the damage sustained by the steering gear.
*662 Thereafter an administrative complaint was filed against McDonald, alleging that he had been negligent or inattentive by failing to exercise due care to ensure that the vessel did not overstand sternward to the point of crossing out of the channel and coming in contact with the west embankment of the channel. The matter proceeded to hearing at which DPR presented the testimony of Captain Hanson, a consultant retained by DPR to investigate the matter; Vincent Straigis, the pilot who docked the Kalliope II in berth 223 before this incident; Ray Odor, the diver who surveyed the damaged rudder and the impact area on the west side of the channel; Captain Rabren, who was piloting his own ship in the channel at the time the Kalliope was being backed into the channel and who had both visual and audio contact with the vessel and its tugs; Anthony Lubrano, the Kalliope's agent; and John McKay, a surveyor employed by the American Bureau of Shipping who surveyed the damaged steering gear. McDonald, who represented himself at the hearing, testified in his own behalf. It was his theory that the vessel was damaged either while still at dock due to overloading of cargo or when Straigis docked the ship.
The hearing officer entered an order recommending that McDonald be found negligent. In reaching his decision, the hearing officer applied the following evidentiary presumption borrowed from federal admiralty cases: evidence that the vessel was navigated outside the channel in the absence of severe weather conditions or mechanical difficulties is prima facie evidence of negligence in piloting the vessel. Woods v. United States Dep't of Transp., 681 F.2d 988, 990 (5th Cir.1982). However, due to the difficulty of the maneuver attempted, the hearing officer recommended a $500 fine, rather than suspension or revocation of McDonald's license. The Board basically adopted the recommended order as its final order, but concluded that other exigent circumstances besides equipment malfunction or severe weather conditions could cause a ship to be navigated outside the channel. Therefore, it modified the presumption set forth in the hearing officer's conclusions of law to state as follows:
Evidence that a vessel was navigated outside the channel where no malfunction of the vessel's equipment is involved, severe weather conditions are not involved, and in the absence of any exigent circumstances, is prima facie evidence of negligence in piloting a vessel.
(Emphasis added.) The Board agreed, however, that appellant was negligent in piloting the vessel and assessed a $500 fine. It is from this final order that McDonald appeals.
Although McDonald raises numerous points on appeal, we consider that only those points relating to the requirement that he file a marine casualty report and the use and application of the prima facie negligence presumption warrant discussion. Turning first to the marine casualty report, Section 310.111, Florida Statutes (Supp. 1986), requires a pilot to report each collision, grounding, or other marine peril to the Board within forty-eight hours, and Section 310.101(1)(g), Florida Statutes (Supp. 1986), provides that failing to file the report or making a false report constitute grounds for disciplinary action. While an argument might be made that these statutes have the effect of compelling a licensee to "testify" by filing the marine casualty report and that such reporting requirement, in effect, raises the threat of economic sanctions (deprivation of his license and thus livelihood) in the event he fails to file the report,[1] there is no provision in the statutes calling for the imposition of a sanction for assertion of the privilege not to make self-incriminating statements.[2] Thus, if appellant had filed the report and asserted therein his privilege at whatever *663 time he believed a truthful statement would be self-incriminating, he would have complied with the reporting requirement under section 310.111 and would not be subject to disciplinary proceedings under section 310.101(1)(g). As this avenue was available to him, his fifth amendment right was not self-executing. See Minnesota v. Murphy, 465 U.S. 420, 434-39, 104 S.Ct. 1136, 1146-48, 79 L.Ed.2d 409, 424-27 (1984). Thus, appellant forfeited his fifth amendment privilege, because he failed to timely assert it.
The department and Board's use and application of the prima facie negligence presumption raises a more trouble-some question. The disciplinary action was brought against appellant based upon violations of Section 310.101(1), Florida Statutes (Supp. 1986), particularly subsections (b), (c), and (k) thereof. Those sections provide as follows:
(1) Any act of misconduct, inattention to duty, negligence, or incompetence; any willful violation of any law or rule, including the rules of the road, applicable to a licensed state pilot or certificated deputy pilot; or any failure to exercise that care which a reasonable and prudent licensed state pilot or certificated deputy pilot would exercise under the same or similar circumstances may result in disciplinary action. Examples of acts by a licensed state pilot or certificated deputy pilot which constitute grounds for disciplinary action include, but are not limited to:
* * *
(b) Failure to obtain or properly use information available to the pilot.
(c) Failure to navigate with caution in restricted visibility.
* * *
(k) Engaging in any practice which does not meet acceptable standards of safe piloting.
Both parties agree that DPR had the burden of proving the violations by clear and convincing evidence, rather than by a mere preponderance of the evidence. See Ferris v. Turlington, 510 So.2d 292, 294-95 (Fla. 1987) (revocation of teaching certificate). In proving its case, however, DPR relied upon the prima facie negligence presumption arising from the evidence showing that the Kalliope II was navigated outside the channel where no equipment malfunction, severe weather, or other exigent circumstances were involved.
Evidentiary presumptions arise as a matter of law, therefore, "the power to establish them is reserved solely to the courts and the legislature. An agency of the executive branch of our government has no authority to formulate an evidentiary presumption." B.R. v. Department of Health & Rehab. Servs., 558 So.2d 1027, 1029 (Fla. 2d DCA 1989), review denied, 567 So.2d 434 (Fla. 1990). An administrative agency "is not a part of the judiciary and this Court can not promulgate rules of practice and procedure for administrative bodies (except in those instances where the constitution or laws so provide), as it may in the instance of State courts as provided in art. V, § 3, Fla. Const. (1968), F.S.A." Canney v. Board of Pub. Instruction of Alachua County, 278 So.2d 260, 262 (Fla. 1973). It clearly follows, therefore, that a state executive branch agency lacks implied or inherent power to fashion, adopt, or apply a legal presumption for application in an administrative proceeding in the absence of specific authority in a statute or the constitution.
The Florida legislature has repeatedly demonstrated how it authorizes the use of presumptions in administrative proceedings when it intends a supervising agency to rely on legal presumptions as establishing grounds for disciplinary sanctions against a licensee.[3] Such statutorily authorized presumptions may be applied in administrative proceedings to carry the agency's burden of proof, e.g., Caldwell v. Division of Retirement, 372 So.2d 438 (Fla. 1979), and may be relied on in agency disciplinary *664 cases to meet the clear and convincing evidence standard, e.g., Ayala v. Department of Professional Reg., 478 So.2d 1116 (Fla. 1st DCA 1985). But there is no authority under Florida law for an agency to adopt and apply a legal presumption in the absence of specific authorization by the legislature. B.R. v. Department of Health & Rehab. Servs., 558 So.2d 1027, 1029 (Fla. 2d DCA 1989), review denied, 567 So.2d 434 (Fla. 1990). Under the principle of strict construction applicable to disciplinary statutes and the principles set forth in the cases cited above, it follows that without any provision for a legal presumption in the disciplinary statutes, the agency lacks authority to adopt a legal presumption that effectively relieves it from having to prove specific acts of misconduct and shifts the burden of proving innocence to the licensee. We have found no such statutory provision authorizing DPR or the Board to adopt or apply any presumption like that applied in this case. Thus, DPR, in urging the Board to adopt the presumption, and the Board, in applying the presumption to support the finding of guilt, greatly exceeded their statutorily delegated authority under Florida law. For this reason, the final order under review should be reversed.
Because the final order clearly relies on that evidentiary presumption to support the conclusion that McDonald is guilty of some misconduct, it is impossible to tell whether DPR or the Board would have come to the same conclusion absent application of that presumption. Consequently, we remand the case to the Board with directions for it to determine, either from the record below, or, at its option, upon the taking of additional evidence, whether the evidence presented, without application of the presumption, is legally sufficient to support a determination of misconduct. Cf. Department of Professional Reg. v. Wise, 575 So.2d 713 (Fla. 1st DCA 1991).
REVERSED and REMANDED for further proceedings.
ZEHMER, J., specially concurs with written opinion.
WENTWORTH, Senior Judge, dissents with written opinion.
ZEHMER, Judge (specially concurring).
I concur in the majority opinion and decision to reverse the appealed order because it was error for the reasons stated in the majority opinion to apply the legal presumption of negligence as the basis of imposing discipline on Captain McDonald. I differ as to the proper disposition on remand, however. In my view, the order should be reversed with directions to dismiss the charges against McDonald. But, having been unable to obtain the two votes required for this result and only to provide a majority vote to reverse and remand, I join with Judge Ervin in remanding to the Board for a determination of whether the evidence presented, without benefit of the presumption, is legally sufficient to support any finding of the misconduct charged. While I appreciate Judge Ervin's desire to have the Board pass on the sufficiency of the evidence without benefit of the presumption, nonetheless, for whatever benefit it may have, I now set forth my views on the insufficiency of the evidence to sustain the specific charges brought against McDonald and explain somewhat more fully why I conclude that the presumption of negligence applied in this case is error.

I.

THE PROCEEDINGS BEFORE THE AGENCY
A careful review of the precise charges alleged in the Department's complaint against Captain McDonald and the hearing officer's findings of fact and conclusions of law with respect to these charges is essential to a complete understanding of the issues in this case. Although I do not agree that all of the findings of fact in the recommended order are supported by competent substantial evidence in the record, my discussion in this opinion is based essentially on the hearing officer's findings *665 of fact as approved and adopted by the Board in its final order.
This proceeding commenced with the Department's filing of an administrative complaint charging the respondent, a state harbor pilot licensed under chapter 310, Florida Statutes, with acts of misconduct while piloting a 17,000 ton vessel, the KALLIOPE II,[1] from a dock in Tampa to the sea. The complaint specifically charged:
5. Respondent had the tug TAMPA made up on the vessel's port quarter for the purpose of towing the ship stern first into cut D channel where it would then be headed for sea.
6. The ships [sic] engines were not used during the sternward towing maneuver.
7. Respondent caused the vessel to be towed across the channel to a point where her rudder contacted the west bank of cut D channel causing extensive damage.
8. Respondent was negligent or inattentive in that he failed to exercise due care to ensure that the vessel he was piloting did not overstand sternward to the point she crossed the channel and contacted the west bank.

9. Based on the forgoing [sic], Respondent is charged with violation of section 310.101(1), Florida Statutes (1986 Supp.) and Pilot Board Rule 21SS-8.007(1)(k), Florida Administrative Code.

(Emphasis added.) Rule 21SS-8.007(1)(k) paraphrases the cited statute[2] and defines *666 actionable misconduct as including "any disregard of safe practice, whether intentional or unintentional, which does not meet acceptable standards of safe pilotage." The charges quoted above would appear to notify McDonald to answer proof that he personally directed the vessel to be towed across the channel when it collided with the west bank of cut D channel and caused "extensive damage" to the rudder and steering system; that this allision was due to his negligent failure "to ensure that the vessel did not overstand sternward to the point she crossed the channel and contacted the west bank"; and that his conduct was negligent because it constituted a disregard of safe practices in violation of acceptable standards of safe pilotage. The maximum authorized penalty for this charge is revocation of McDonald's pilotage license. § 310.101(2), Fla. Stat. (1986 Supp.); Rules 21SS-7.005(1)(a), 21SS-8.007(2)(b), Fla. Admin. Code.
McDonald represented himself at the hearing. There was nothing alleged in the charges to alert him that the Department and the Board would rely on a non-statutory and non-rule presumption of negligence that would require him to prove that his misconduct did not cause the alleged accident. After considering the modest amount of testimony and documentary evidence presented by both parties, the hearing officer entered a recommended order reciting the following findings of fact:
3. Kalliope II is a Liberian registered vessel of some 17,000 gross tons, 584 feet in length, and at the time of departure from berth 223, had a maximum draft of 34 feet, six inches. The Kalliope II was moored starboard side to berth 223, and two tugs were available to assist in the undocking.
4. Prior to undocking, the steering gear was tested and performed satisfactorily. A physical check of the steering engine room was not conducted. The bow of the Kalliope was swung out in a pivot test to insure the bow was not aground. This was accomplished by slacking the bow lines and taking in on the stern lines. A similar pivot to ensure the stern was not aground was not accomplished.
5. In undocking the Kalliope II, Respondent had the tug Tampa on the stern on a hawser and the tug Orange on the port bow. As the vessel cleared the slip, the Orange was cast off and stood by with the Tampa towing the Kalliope II into Cut D Channel. Because of the deep draft of the Kalliope II, Respondent did not use the vessel's engines in this maneuver.
6. The Kalliope II as noted above, is 584 feet long and Cut D Channel is 400 feet wide. In order to keep the stern from striking the west bank of the channel while backing out of berth 223, it is necessary to pivot the vessel to move the stern northward while keeping the bow clear of the docks.
7. While backing away from berth 223, the only control of movement used was that supplied by the tug Tampa. Twice the captain of the Tampa advised Respondent that the stern of the Kalliope II appeared to be getting too close to the Davis Island seawall just west of Cut D Channel. The first time this information was passed to Respondent, he directed the tug to come ahead slow, and the second time the tug was directed to come ahead full. Thereafter, the Kalliope II was aligned in Cut D Channel. At this time, Respondent ordered the engines ahead slow and had the Tampa cast off. The weather was not a contributing factor at this time.
8. At no time between 2200 hours, the time the Kalliope II left berth 223, until the Kalliope II was finally aligned with Cut D Channel, did Respondent feel the Kalliope II touch bottom.
9. While proceeding down Tampa Bay, Respondent noticed the helmsman was using 20 degrees rudder to keep the vessel in the channel, and directed one of the ship's crew to check the steering engine room. When this was done, it was discovered that the steering mechanism had suffered considerable damage, and the vessel could no longer be controlled with the steering gear. Tugs *667 were again called, and the Kalliope II was returned to a dock.
10. Underwater divers surveyed the damage to the rudder, and other surveyors checked the damage to the gear in the steering room.
11. Examination of the rudder showed heavy damage with the trailing edge of the bottom of the rudder bent some 25 degrees from the top of the rudder. Build up of streaks of clay on the port side of the rudder, with the rudder damage sustained, is indication of the rudder striking the bank while the ship was backing down. (Exhibit 5)
12. Examination of the steering gear inside the steering room revealed the steering equipment had been seriously damaged and was inoperable. The damage was consistent with damage to be expected if a ship struck the edge of the channel with the rudder while backing down.
13. Divers searched the west bank of Cut D Channel in the vicinity of berth 223 and found an impact area opposite and just north of berth 223. The impact area was approximately 40 feet long parallel to the channel with clay substrata welled upwards through the sand and mud giving the appearance of the embankment having been struck by a large heavy force. (Exhibit 6)
The conclusions of law in the recommended order then recite that the charges against McDonald are based on violations of the following subparagraphs of section 310.101(1):
(b) Failure to obtain or properly use information available to the pilot;
(c) Failure to navigate with caution in restricted waters;[3]
(k) Engaging in any practice which does not meet acceptable standards of safe piloting.
The recommended order properly states that the burden is on the Department to prove by clear and convincing evidence that McDonald was guilty of negligence as alleged, citing Ferris v. Turlington, 510 So.2d 292 (Fla. 1987). However, the order then sets forth a legal presumption relied on to support the recommended finding of guilty:
When a moving vessel strikes a fixed object, there is a presumption that the moving vessel is at fault. John R. Woods[4]
Evidence that a vessel was navigated outside the channel where no malfunction of the vessel's equipment is involved and severe weather conditions did not contribute is prima facie evidence of negligence in piloting a vessel.
In reaching this conclusion, the difficulty in backing a 584 foot vessel into a 400 foot wide channel has been considered. Here Respondent had two tugs and could have used the ship's engines if desired. It could well be deemed prudent to refrain from using the ship's engines due to the small clearance under the vessel's keel; however, in hindsight, it was not prudent to use only one tug when two were readily available, and there was little clearance in which to operate. No evidence was presented regarding the position of the rudder as the Kalliope II was towed from berth 223. From the manner in which the rudder was bent and the location of mud streaks on the rudder, the damage could have been caused by the vessel backing into the bank with the rudder to the right. Also, such damage could have been caused by the tug Tampa pulling the stern (and rudder) through the side of the channel if the rudder was amidships. With the bottom part of the rudder in clay in more dense soil than the top part of the rudder, such movement would tend to bend the rudder as apparently happened here.
* * *
From the foregoing, it is concluded that Respondent was negligent in allowing *668 the stern of the Kalliope II to be towed into the west bank of Cut D Channel; however, due to the difficulty of the maneuver attempted, this was not an egregious error.
(Emphasis added.)
The Board's final order adopted all of the findings of fact in the recommended order with a single exception having no importance here. The final order likewise adopted the conclusions of law with a single exception directed to the presumption of negligence set forth in the second paragraph of the conclusions (emphasized in the language quoted above):
The Board concludes that there may be other exigent circumstances besides equipment malfunction and severe weather which may cause a vessel to be navigated outside the channel, such as avoiding a collision or an obstruction. The Board therefore modifies the above cited conclusion of law as follows:
"Evidence that a vessel was navigated outside the channel where no malfunction of the vessel's equipment is involved, severe weather conditions are not involved, and in the absence of any exigent circumstances, is prima facie evidence of negligence in piloting a vessel."
[Emphasis added]. The final order imposed the $500 fine recommended by the hearing officer.

II.

ERRORS IN THE FINAL ORDER
The final order should be reversed for several reasons. The findings of fact and conclusions of law in the recommended order, as approved and adopted in the Board's final order, are legally insufficient to support a ruling that McDonald committed any violation of the applicable statute. The vessel undoubtedly collided with the bank while backing down under McDonald's pilotage, but there is no finding of fact identifying any specific negligent act by McDonald personally. Whether McDonald's conduct deviated from the standards of care required of a licensed pilot under the cited statutory provision can be proved only through expert testimony establishing the requisite professional standards he is said to have violated; yet, no expert testimony was presented to establish these standards. In lieu of such expert testimony, the hearing officer and the Board postulated and relied on the stated presumption of prima facie negligence based on the occurrence of the allision, notwithstanding that the governing Florida statutes make no provision whatsoever for this presumption. They lifted this presumption from federal admiralty cases in which a preponderance of the evidence was the applicable burden of proof  not the clear and convincing evidence standard applicable in this case. The presumption as postulated by the Board differs from that stated and applied in the recommended order in that the Board added an additional exculpatory condition that the incident must have occurred "in the absence of any exigent circumstances"; yet, the hearing officer did not make any finding of fact that this incident occurred in the absence of any exigent circumstances in addition to the two circumstances described by the hearing officer. Since the application of the prima facie evidence presumption postulated by the Board is invalid and illegally applied in this case, there is no basis for sustaining the appealed order on the evidence in this record.

A.

INSUFFICIENCY OF THE EVIDENCE
The evidence presented to the hearing officer and the Board was legally insufficient to support a finding of guilt without the application of the presumption, primarily because it failed to prove any specific violation of a statutory provision. The Board's power to discipline Captain McDonald stems from section 310.101, Florida Statutes (1986 Supp.).[5] Reading each lettered subparagraph of section 310.101(1) in context, applying the principle of ejusdem *669 generis,[6] the clear statutory intent is to impose discipline only for personal misconduct of a licensed pilot. There is no language to clearly evidence a legislative intent to impose on a state licensed pilot vicarious responsibility for the neglect or misconduct of others, i.e., to hold the pilot strictly responsible for the conduct of all other personnel involved in operating and maneuvering the vessel at the time the allision occurred. The statute does not purport to impose any nondelegable duties on a state licensed harbor pilot that would give rise to personal responsibility for the negligent acts of others. Under Florida law, disciplinary statutes such as section 310.101 are penal in nature and must be strictly construed against the enforcing agency; thus, without a clear, unambiguous provision in the statute indicating legislative intent to hold the licensee responsible for the negligent or wrongful acts committed by another, the administrative agency is not authorized to so extend the effect of the statute. See Federgo Discount Center v. Department of Professional Regulation, Board of Pharmacy, 452 So.2d 1063 (Fla. 3d DCA 1984); Davis v. Department of Professional Regulation, 457 So.2d 1074 (Fla. 1st DCA 1984).[7]
In this regard, the Board erroneously relies on Alles v. Department of Professional Regulation, 423 So.2d 624 (Fla. 5th DCA 1982), as authority to impose vicarious liability on McDonald under section 310.101; in so doing, it has misread the actual holding in that case.[8] In Alles, the respondent licensed contractor was disciplined for his personal acts of misconduct, i.e., lending his certification to be used by another and failure to undertake and carry out statutorily-mandated personal supervision *670 of the construction project involved, which was a nondelegable duty; he was not disciplined for the misdeeds of others on a theory of vicarious responsibility. Perhaps this case would have some applicability had McDonald turned the piloting of the ship over to another, contrary to his statutory duties as a licensed pilot, but that simply is not the charge made nor the facts proven by the evidence.
A proceeding to enforce the disciplinary provisions of chapter 310 is governed by the Florida Administrative Procedure Act, chapter 120, Florida Statutes. Although the act is silent on the subject, it is now well established that the burden of proof is on the party asserting the affirmative of an issue, in this instance the Department of Professional Regulation. Balino v. Department of Health and Rehabilitative Services, 348 So.2d 349 (Fla. 1st DCA 1977); Florida Dept. of Transp. v. J.W.C. Co., 396 So.2d 778, 788 (Fla. 1st DCA 1981). It is equally well settled that, in administrative disciplinary proceedings, the moving agency must set forth the charges against the licensee with specificity, carry the burden of proving each specific charge, and set forth in the final order explicit findings of fact and conclusions of law addressing each specific charge. E.g. Davis v. Department of Professional Regulation, 457 So.2d 1074 (Fla. 1st DCA 1984); Lewis v. Department of Professional Regulation, 410 So.2d 593 (Fla. 2d DCA 1982); Wong v. Career Service Comm'n, 371 So.2d 530 (Fla. 1st DCA 1979).[9] Where the licensee is charged with a violation of standards of professional conduct and the specific acts or conduct required of the professional are explicitly set forth in the statute or a valid rule promulgated pursuant thereto, the burden on the agency is to show a deviation from the statutorily-required acts; but where the agency charges negligent violation of general standards of professional conduct, i.e., the negligent failure to exercise the degree of care reasonably expected of a professional, the agency must present expert testimony that proves the required professional conduct as well as the deviation therefrom. Purvis v. Department of Professional Regulation, 461 So.2d 134 (Fla. 1st DCA 1984).[10]
Addressing, in light of these legal precepts, the specific charges alleged against McDonald (supra, pp. 12-13) and the statutory provisions he was found to have violated (supra, p. 15), it is fair to say that to meet the requirements of chapter 120 one would expect to read explicit findings of fact and conclusions of law describing the specific information McDonald failed to obtain and in what specific respects he failed to properly use information available to him, contrary to established safe piloting practices required by section 310.101(1)(b). One would expect to read explicit findings describing the precise facets of McDonald's personal actions that constituted a failure to navigate with caution in these restricted waters and the safe piloting practices from which he deviated in violation of section 310.101(1)(c).[11] One would expect to read *671 explicit findings describing the specific "practice" which McDonald engaged in that did not meet acceptable standards of safe piloting, and a description of the acceptable standard or practice from which McDonald deviated to constitute a violation of section 310.101(1)(k). This kind of specificity is required in disciplinary orders entered in accordance with chapter 120, the burden of proof is clearly on the Department to adduce evidence to support findings with this degree of specificity, and the agency's final order must contain findings of fact that are equally specific. See Davis, Lewis, Wong, and Purvis, supra.
In the instant case, however, there is no expert testimony establishing the minimum acceptable standards of pilotage. There are no findings of fact specifying the precise conduct that constituted a negligent violation of such standards other than the proven occurrence of the allision while the vessel was under McDonald's charge as a pilot. For example, the order contains a finding of fact that on two occasions the captain of the Tug TAMPA advised McDonald that the stern of the Kalliope II "appeared to be getting too close to the Davis Island seawall just west of Cut D Channel," and on each occasion McDonald responded with instructions to the tug to increase power. Yet there is no evidence to establish, and thus no finding of fact, that these instructions were inadequate or untimely under the circumstances; and there is no finding of fact on whether these instructions were timely carried out by the tug in accordance with McDonald's directions, no doubt because there was no testimony to establish this essential fact. Certainly, Captain McDonald could not be disciplined for negligent piloting if the instructions issued were adequate but the allision occurred because not timely and effectively carried out by the tug captain. Another critical finding of fact lacking the requisite specificity states that the rudder of the Kalliope II collided with the channel bank and caused serious damage to the steering system at some time, presumably while undocking under McDonald's supervision. But whether this occurrence was due to specific acts of misfeasance by McDonald is found only by applying the presumption of negligence to the occurrence of the proven allision. Such equivocal findings of fact as these on the critical issues of negligence and causation do not satisfy the clear and convincing standard of proof imposed by Florida law.
The conclusions of law in the order are equally lacking in specificity as to McDonald's precise conduct said to violate the statutory provisions relied on. As a consequence, the recitations in the recommended order are equally nonspecific, using phrases such as it "could well be deemed prudent" and it "could have been caused." For example, the hearing officer concluded that McDonald had two tugs and "in hindsight" he should have used both tugs, even though "there was little clearance in which to operate"; yet, there is not a single finding of fact (nor any evidence of which I am aware to support such a finding) that two tugs could have been used effectively throughout that maneuver in such a restricted space, or that any recognized pilotage standard would require the use of two tugs rather than one tug under the circumstances. Furthermore, the recommended order concedes the absence of evidence as to the operation of the rudder during this entire maneuver, saying there is no evidence of its position as the vessel was towed from the berth. Thus, the hearing officer could only speculate as to the rudder's position during the undocking maneuver and the manner in which the discovered damage "could have been caused" during the maneuver.
In summary, one is left to speculate just exactly what personal conduct of McDonald violated any one of the three statutory provisions cited in the recommended order. It is only by presuming negligence based on the obvious fact that, while under McDonald's control, the vessel at some point, for some reason, and in some manner suffered an allision with the west bank of the narrow channel as it was being towed from its berth in an admittedly difficult maneuver. Thus, the evidence, and the findings of fact based on the evidence, are legally insufficient to support the Board's *672 finding of guilt. Only by relying on the erroneous rule of law postulating a presumption of prima facie negligence was the Board able to conclude that McDonald was guilty of misconduct.

B.

INVALIDITY OF THE PRESUMPTION
Neither the Department nor the Board have any statutorily-delegated authority to postulate, adopt, and apply a presumption establishing a prima facie case of negligence based on the occurrence of an accident, and their doing so in this case is in direct violation of established Florida law. The final order postulates the evidentiary presumption relied on (supra, p. 667) in terms of an evidentiary standard that navigating a vessel outside the channel, where certain described conditions are not involved and "in the absence of any exigent circumstances, is prima facie evidence of negligence in piloting a vessel." The postulated rule is a legal presumption borrowed or fashioned from federal admiralty law and applied as the rule of law governing the Department's and the Board's practice and procedure in this administrative law case. This rule is clearly a legal presumption, not merely a statement of permissible inferences that may be drawn by the trier of fact:
The terms "presumption" and "inference" are used by some courts loosely or interchangeably, although they are different in nature and may be different in effect; inference is regarded as a permissible deduction from the evidence before the court that the jury may accept or reject, or accord such probative value as it desires, while presumption is, characteristically, a rule of law fixed and relatively definite in its scope and effect, that attaches to certain evidentiary facts and is productive of specific procedural consequences.

(Emphasis added). 23 Fla.Jur.2d, Evidence and Witnesses § 80 (1980). Thus, in Thomason v. Miami Transit Co., 100 So.2d 620, 622 (Fla. 1958), the supreme court stated:
We have the view that the trial judge committed no error in instructing the jury that the mere happening of an accident raises no presumption of negligence. We do not consider this a case for the application of the doctrine of res ipsa loquitur. Appellant contends that the occurrence of the accident might create a justifiable inference of negligence. While this may be true under some circumstances, we detect a distinction between a situation that would create a "presumption" as distinguished from circumstantial evidence that would justify an "inference." The creation of a presumption would have the effect of making a prima facie case without more. The creation of an inference merely enables the jury to draw the inference and weigh it in the balance with all of the other evidence.

(Emphasis added). See also Stanek v. Houston, 165 So.2d 825, 827 (Fla. 2d DCA 1964) ("An inference is a deduction from facts which reason dictates, but a presumption is an arbitrary conclusion which the law directs to be made from certain facts."). No doubt the hearing officer was legally authorized to draw legitimate inferences from proven evidentiary facts as part of the fact-finding function; but the presumption applied in this case constitutes a rule of law governing practice and procedure in all agency disciplinary proceedings such as this one.
In postulating that a prima facie case of negligence is established by proof of the allision, the Board has expressed an official policy to hold state pilots accountable for discipline upon proof of such facts unless the pilot is able to absolve himself from fault. As such, this presumption is a rule of law that shifts the burden of proof to the licensee. Cf. Wardell v. DOT, 884 F.2d 510 (9th Cir.1989); American Petrofina Pipeline Co. v. M/V Shoko Maru, 837 F.2d 1324 (5th Cir.1988); Delta Transload, Inc. v. M/V Navios Commander, 818 F.2d 445 (5th Cir.1987).[12] Although rebuttable, the *673 presumption nevertheless shifts to the licensee the burden of overcoming its legal effect by the applicable standard of proof:
When evidence rebutting such a presumption is introduced, the presumption does not automatically disappear. It is not overcome until the trier of fact believes that the presumed fact has been overcome by whatever degree of persuasion is required by the substantive law of the case. This may be by a preponderance of the evidence or by clear and convincing evidence, as the case may be.
Caldwell v. Division of Retirement, 372 So.2d 438, 440 (Fla. 1979). Because it is an expression of agency policy that will support a finding of guilt even in the presence of contradictory evidence, it is not appropriate to characterize this presumption as a "bursting bubble" or vanishing presumption. See id. at 440.
As stated in the majority opinion, an agency of the executive branch such as the Department of Professional Regulation and the Board has no authority to formulate or promulgate an evidentiary presumption as it did in this case. The power to create evidentiary presumptions upon which an agency is authorized to rely in disciplining a license holder rests with the legislature. However, the error in applying the presumption of negligence in this case goes beyond the matter of a lack of authority; it is based on a misconception of the nature and operation of its counterpart in federal admiralty law.

C.

THE ADMIRALTY PRESUMPTION IS NOT APPROPRIATE FOR USE UNDER FLORIDA LAW
Use of the admiralty presumption in this state agency disciplinary proceeding not only exceeds the agency's authority contrary to Florida law, its purpose and operation under federal law does not serve as a rational basis for enforcing the Florida statutory law governing the discipline of state licensed pilots. As previously discussed, a harbor pilot is subject to discipline under section 310.101 only for personal misconduct; chapter 310 does not undertake to punish a state pilot vicariously for the derelictions of other persons acting under his charge under a nondelegable duty theory. The presumption adopted by the Board, however, necessarily operates to hold a pilot responsible for the negligent conduct of other persons operating the vessel under his pilotage. That is the essence of the burden of proof presumption the Department and the Board "borrowed" from federal admiralty law cases, apparently without clearly examining the underlying rationale and import of those decisions.
The case on which the Board primarily relies is Woods v. United States of America, Department of Transportation, 681 F.2d 988 (5th Cir.1982), an appeal of a proceeding under federal law to discipline a tugboat master. In Woods, a prima facie case of negligence against the master was made out by the mere showing that a barge being pushed by the tugboat under the master's charge collided with a wharf and a boat moored to the bank. This was said to give rise to a presumption of negligence against the tugboat master, which shifted the burden of proof to him to disprove that he was at fault.[13] Because the master failed to carry that burden of proof, an order admonishing him for negligence was entered and affirmed on review by the court. The presumption so applied was created by federal court decisions in damage *674 cases governed by admiralty law, and it has long been an established rule of admiralty law governing recovery of damages from a shipowner due to the negligent operation of the ship, as evidenced by the three admiralty damage cases cited in Woods as authority for the presumption.[14] In Delta Transload, Inc. v. M/V Navios Commander, 818 F.2d 445 (5th Cir.1987), an action against a ship for damages to a mooring buoy, the court described the legal effect of the presumption:
When a moving vessel strikes a stationary object, such as a navigational aid, a presumption generally arises that the vessel is at fault. The presumption operates against all parties who participated in the management of the vessel during the anchoring process. In this case, the pilot, master, bow crew, and the Smith line handlers participated in the management of the vessel and would be ordinarily subject to the presumption.
The party against whom the presumption operates bears the burden of disproving it, not merely coming forward with countervailing evidence... .
818 F.2d at 449 (emphasis added). Because the presumption operates against all parties, it can be rebutted only by showing that the ship acted with reasonable care. American Petrofina, 837 F.2d at 1326.
In Woods, the court did not explain the rationale for taking this presumption of negligence theretofore used only in damage cases based on a nondelegable duty theory and applying it in a proceeding to discipline a master. Similarly, in Wardell v. Department of Transportation, 884 F.2d 510 (9th Cir.1989), a federal proceeding to discipline a federally licensed pilot for negligence due to an allision between the pilot's vessel and a dock, the court affirmed the application of the admiralty law's presumption of negligence in upholding the administrative suspension of the pilot's license, but again the court did not state the rationale for doing so. In both cases, however, it is evident that the master or pilot was being held responsible for the conduct of the entire crew. Because the presumption under federal admiralty law operates to hold a pilot or master liable in damages even though the active negligence of others in the crew may have been the actual cause of the allision, these cases appear to establish that under federal law a pilot and master may likewise be held vicariously responsible for the negligence of others participating in the operation of the vessel on the theory that federal law places the pilot and master under nondelegable duties to safely navigate the vessel at all times it is in their charge.
Federal disciplinary proceedings against a pilot, master, or licensed crew member are governed by 46 U.S.C. § 7703. Its predecessor statute has been characterized as a remedial statute, not a penal statute, so that revocation of a license as therein provided may be viewed as a remedy to promote better safety and efficiency in marine *675 operations rather than as punishment for an offense committed. See 46 U.S.C.S. § 7703 Interpretive Notes and Decisions, citing to 24 Op. Att'y Gen. 136. Under admiralty law, the standard of proof in damage cases is by a preponderance of evidence, as shown in the cases cited above. Similarly, the standard of proof required in Woods and Wardell, both being federal administrative law cases, is proof by a preponderance of the evidence. See Steadman v. Securities Exchange Commission, 450 U.S. 91, 101 S.Ct. 999, 67 L.Ed.2d 69 (1981) (preponderance of the evidence is the appropriate standard of proof to be applied in proceedings governed by 5 U.S.C. § 556); 46 U.S.C. § 7702 (a) (Coast Guard licensure actions are governed by 5 U.S.C. §§ 551-559). See also 2 Am.Jur.2d Administrative Law § 392 (1990 Supp.).
In contrast to the federal disciplinary proceedings, state disciplinary proceedings against a pilot are penal in nature, and the standard of proof required is clear and convincing evidence. See Ferris v. Turlington, 510 So.2d 292 (Fla. 1987) (the standard of proof to be applied in license revocation proceedings brought under chapter 120 is proof by clear and convincing evidence).[15] This is so under Florida law because such proceedings "implicate a loss of livelihood" and therefore are "of sufficient gravity and magnitude to warrant a standard of proof greater than a mere preponderance of the evidence." 510 So.2d at 294 (emphasis added). As previously discussed, the agency seeking revocation of a state pilot's license has the burden of affirmatively presenting evidence, based on clear and convincing proof, that the licensee committed the specific violations alleged as the basis for the disciplinary proceeding. The agency cannot meet this exacting standard of proof by postulating its own legal presumption that shifts the burden of proof to the pilot to prove that the allision was due to some cause other than the pilot's personal negligence. This is so because a harbor pilot is not in physical control of the vessel he is attempting to navigate. A harbor pilot's navigational duties require that he direct navigational commands to the master of the vessel he is piloting; the master, in turn, has the duty to relay those commands to the crew members who perform the actual maneuvers necessary to navigate the vessel. See Register v. Pierce, 530 So.2d 990 (Fla. 1st DCA), rev. denied, 537 So.2d 569 (Fla. 1988); Victorias Milling Co. v. Panama Canal Co., 272 F.2d 716, 721 (5th Cir.1959); Andros Shipping Co. v. Panama Canal Company, 184 F. Supp. 246 (DCCZ 1960), affirmed, 298 F.2d 720 (5th Cir.1962). "The amount of actual control exercised by [a] pilot is limited by the efficiency and cooperation of the ship's personnel." Victorias Milling Co., 272 F.2d 716, 721. While the pilot is obligated to use his best care, skill, and judgment in navigating a vessel, he cannot insure the vessel's safety because the actual navigation of the vessel is outside his control. See Andros Shipping Co. v. Panama Canal Company, 184 F. Supp. 246, 257 (DCCZ 1960), affirmed, 298 F.2d 720 (5th Cir.1962). Absent the exercise of actual control over the vessel, which a pilot obviously does not have, there is no more justification under Florida law for presuming the pilot was negligent in a disciplinary proceeding merely because the vessel was involved in an allision than there is for applying the doctrine of res ipsa loquitur rejected in the above-cited cases.
I would conclude, therefore, that the evidence is legally insufficient to sustain the specific charges against Captain McDonald. But, for the reason previously stated, I join with Judge Ervin in reversing and remanding for further consideration by the Board.
WENTWORTH, Senior Judge, dissenting.
I respectfully disagree with the application of the stated rule in B.R. v. Department of Health & Rehabilitative Services, *676 558 So.2d 1027, 1029 (Fla. 2d DCA 1989), 567 So.2d 434 (Fla. 1990), as the basis for reversing the decision here. B.R. states expressly that "HRS used the twenty-four hour rule [on bruise duration] as a conclusive presumption... . The accused person could not rebut this presumption." Id. at 1029 (emphasis supplied). The court's accompanying statement (without cited authority) in B.R.  that "[a]n agency ... has no authority to formulate an evidentiary presumption"  must be read as directed and confined to a conclusive "evidentiary presumption," since that was the only issue before the Second District panel.
In contrast, the present case clearly does not involve a conclusive presumption. See, e.g., State v. Rolle, 560 So.2d 1154, 1157 (Fla.) (concluding as to a statutory presumption that the DUI statute, which provides that proof of "0.10 percent or more by weight of alcohol in the person's blood ... shall be prima facie evidence" of impairment, creates only a permissive inference) (citation omitted; emphasis deleted), cert. denied, ___ U.S. ___, 111 S.Ct. 181, 112 L.Ed.2d 144 (1990); compare Wihlelm v. State, 568 So.2d 1, 3 (Fla. 1990) (holding that absent definition the jury may have erroneously interpreted the term "prima facie evidence" in a jury instruction to compel a finding of intoxication upon proof of a blood-alcohol level of 0.10 percent or higher). The majority opinion recognizes the merely prima facie and rebuttable nature of the evidentiary device in question.
Reliance on Canney v. Board of Public Instruction, 278 So.2d 260 (Fla. 1973) (on reh'g), is also misplaced. There, the Court simply stated the truism that an administrative body cannot promulgate rules of practice and procedure unless authorized by law. I find no basis for an unwarranted extension of Canney by confusing the promulgation of rules of practice and procedure with the use of rebuttable evidentiary devices which are well rooted in the law of the subject matter regulated.
I would affirm on the basis of issues briefed by the parties. See Tomlinson v. Department of Health & Rehabilitative Services, 558 So.2d 62, 66 (Fla. 2d DCA 1990) (observing that "[i]t is at least arguable that DOA has broader authority to create reasonable presumptions for use at its own hearings. Since this issue has not been briefed, we decline to rule upon it.").
NOTES
[1] See Minnesota v. Murphy, 465 U.S. 420, 434, 104 S.Ct. 1136, 1146, 79 L.Ed.2d 409, 424 (1984) (probationer required to appear before his probation officer and truthfully answer questions regarding probationary status).
[2] Because license revocation or suspension proceedings are penal in nature, the fifth amendment right to remain silent applies. State ex rel. Vining v. Florida Real Estate Comm'n, 281 So.2d 487, 491 (Fla. 1973).
[3] See, e.g., §§ 457.109(1)(j), 458.331(1)(j), 458.331(1)(q), 459.015(1)(m), 459.015(1)(u), 461.013(1)(p), 462.14(1)(k), 462.14(1)(q), 465.016(1)(i), 466.018(1), 466.018(2), 466.028(1)(q), 468.217(1)(k), 468.365(1)(r), Fla. Stat. (1989).
[1] The name of the vessel is referred to variously throughout the record as "KALLIOPE" and "CALLIOPI." I shall use the name in the text.
[2] Section 310.101(1), Florida Statutes (1986 Supp.), provides in pertinent part:

(1) Any act of misconduct, inattention to duty, negligence, or incompetence; any willful violation of any law or rule, including the rules of the road, applicable to a licensed state pilot or certificated deputy pilot; or any failure to exercise that care which a reasonable and prudent licensed state pilot or certificated deputy pilot would exercise under the same or similar circumstances may result in disciplinary action. Examples of acts by a licensed state pilot or certificated deputy pilot which constitute grounds for disciplinary action include, but are not limited to:
(a) Failure to make allowances for the foreseeable effects of wind, current, and tide.
(b) Failure to obtain or properly use information available to the pilot.
(c) Failure to navigate with caution in restricted visibility.
(d) Navigating in channels where the depth of water under the keel is less than the prescribed bottom clearance as recommended by the licensed state pilots of that port and approved by the board.
(e) Excessive speed.
(f) Having a license or certificate to practice piloting revoked or suspended by the regulatory authority of another state, the Federal Government, a territory, or another country for an act which would constitute a ground for discipline if it had occurred in this state.
(g) Making or filing, or inducing another person to make or file, a report which the pilot knows to be false or intentionally or negligently failing to file, or willfully impeding or obstructing the filing of, a report or record required by state law or by rule of the board or the department. Such reports or records include only those which are signed by the pilot in his capacity as a licensed state pilot or certificated deputy pilot.
(h) Being unable to perform the duties of a pilot with reasonable skill and safety by reason of illness or use of alcohol, drugs, narcotics, chemicals, or any other type of material or as a result of any mental or physical condition such as, but not limited to, poor eyesight or hearing, heart disease, or diabetes. In enforcing this paragraph, the department shall have authority, upon recommendation of the probable cause panel of the board, to compel a licensed state pilot or certificated deputy pilot to submit to a mental or physical examination by physicians designated by the department. The failure of a pilot to submit to such an examination when so directed constitutes an admission of the allegations against him, unless the failure is due to circumstances beyond his control, consequent upon which an emergency suspension order may be entered by the department suspending the pilot's license until he complies with the order for a compulsory mental or physical examination. A licensed state pilot or certificated deputy pilot affected under this paragraph must be afforded, at reasonable intervals, an opportunity to demonstrate that he can resume the competent practice of piloting with reasonable skill and safety.
(i) Practicing or offering to practice beyond the scope permitted by law or accepting and performing professional responsibilities that the pilot knows or has reason to know he is not competent to perform.
(j) Delegating professional responsibilities to a person when the pilot delegating such responsibilities knows or has reason to know that such person is not qualified by training, experience, or license to perform them.
(k) Engaging in any practice which does not meet acceptable standards of safe piloting.
[3] This subsection of the statute actually refers to "restricted visibility" rather than "restricted waters." See discussion of the statute infra at p. 669.
[4] This is intended to be a reference to the decision in Woods v. United States, Dept. of Transp., 681 F.2d 988 (5th Cir.1982).
[5] See note 2, supra.
[6] "Under this rule, where the enumeration of specific things is followed by a more general word or phrase, the general phrase is construed to refer to a thing of the same kind or species as included within the preceding limiting and more confining terms." 49 Fla.Jur.2d, Statutes § 128 (1984).
[7] In Federgo Discount Center, the court held that a community pharmacy permittee's license was not subject to revocation for misdeeds of its chosen licensed pharmacist because there was no clear provision in the statute making the pharmacy permittee, who was not a licensed pharmacist, strictly liable in a vicarious sense for the acts of the licensed pharmacist employed by the permittee. The court's holding was predicated on the well-settled rules that "an administrative agency, empowered to revoke a license or permit for reasons specified in a statute, may not revoke such license or permit for some other cause not clearly within the ambit of its statutory authority" and disciplinary statutes, "being penal in nature, must be strictly construed." 452 So.2d at 1066.
[8] In Alles, the Construction Industry Licensing Board sought to suspend or revoke Alles's license as a contractor. Alles was the "qualifying contractor agent" for Univel, Inc., the general contractor on the subject building which had collapsed during construction. Univel had an arrangement with Dynamic Construction Co. to perform the actual construction, so Dynamic's unlicensed agent, Stoner, rather than Alles, obtained the building permit and provided on site supervision of the construction. The Board charged that Alles, as the qualifying agent on the project, "had the statutory duties to affix his license number to the bids and contracts for the Harbor Cay project and to supervise and be professionally responsible for construction of that project"; however, the facts were undisputed that he did not do so. The hearing officer concluded that the statutes in chapter 489 regulating licensed contractors did not place such duties on Alles. The Board disagreed, rejecting this conclusion. The issue presented to the appellate court was solely one of statutory construction, and the court, agreeing with the Board, construed sections 489.105, 489.113, and 489.119 together, and held:

The obvious purpose of these statutes allowing a company to act as a contractor through a licensed contractor is to insure that projects undertaken by a company are to be supervised by one certified and licensed by the board. To allow a contractor to be the "qualifying agent" for a company without placing any requirement on the contractor to exercise any supervision over the company's work done under his license would permit a contractor to loan or rent his license to the company. This would completely circumvent the legislative intent that an individual, certified as competent, be professionally responsible for supervising construction work on jobs requiring a licensed contractor. Thus, the Board was correct in determining that appellant had a statutorily imposed professional duty, as sole qualifying agent of record of Univel, to supervise all of Univel's projects.
423 So.2d at 626. The court also rejected Alles's argument that Stoner's status as a non-record de facto qualifying agent served to reduce Alles's duty to provide supervision, construing the statutes as essentially imposing non-delegable duties in this regard. Id. at 627.
[9] The court stated in Wong:

[T]he Administrative Procedures Act requires that the administrative order must set forth the findings of fact with particularity, must explain the conclusions of law in light of the findings of fact, and must respond to countervailing arguments and proposed findings of fact submitted to the agency by a party.
371 So.2d at 531.
[10] Regarding the charge of negligence and incompetence in the practice of veterinary medicine made against Dr. Purvis, the court stated:

"Unlike a charge of violating a statute or rule under section 474.214(1)(g), which requires no proof of a standard of care, the charge against Dr. Purvis necessarily required evidentiary proof of some standard of professional conduct as well as deviation therefrom. * * * Of greater importance, however, is the fact that the Board never introduced any evidence at the administrative hearing to show the appropriate standard of care which it contends Dr. Purvis failed to meet. The Board introduced no expert testimony, no statute, no rule, nor any other type of evidence to establish the appropriate standard of care or that Dr. Purvis fell below that standard."
461 So.2d at 136.
[11] As previously noted (supra, note 2), the statute actually refers to "restricted visibility" and there is no evidence or finding of fact that this operation was conducted under conditions of restricted visibility. Hence, this particular provision of the statute has no pertinence to this case whatsoever, and most assuredly cannot be relied on as a basis for any finding of guilt.
[12] Each case applied the admiralty law presumption of negligence discussed infra.
[13] The Woods court described the presumption as having the following effect:

When a moving vessel collides with a fixed object there is a presumption that the moving vessel is at fault, and this presumption suffices to make out a prima facie case of negligence against the vessel. .. . The burden of proof of fault by the moving vessel requires demonstration that its operator did all that reasonable care required... . The presumption of negligence applies to the operator as well as to the vessel. It works against all parties participating in the management of the vessel at the time of contact.
(Emphasis added) 681 F.2d at 990, citing Brown and Root Marine Operators, Inc. v. Zapata Off-Shore Co., 377 F.2d 724 (5th Cir.1967); Merrill Trust Co. v. Bradford, 507 F.2d 467 (1st Cir.1974); Freeport Sulphur Co. v. S/S HERMOSA, 526 F.2d 300 (5th Cir.1976), each being a damages case in admiralty.
[14] The historical development and operation of the presumption is concisely summarized in American Petrofina Pipeline Co. v. M/V Shoko Maru, 837 F.2d 1324 (5th Cir.1988), an action for damages due to a ship's collision with a dock:

Under general maritime law and the law of this court, there is a long-standing presumption that, when a moving ship collides with a stationary object, the moving ship is at fault. The Oregon, 158 U.S. 186, 192-93, 15 S.Ct. 804, 807, 39 L.Ed. 943 (1895); Delta Transload, Inc. v. M/V Navios Commander, 818 F.2d 445, 449 (5th Cir 1987); United States v. T/B Arcadian, 714 F.2d 470, 474 (5th Cir.1983). This presumption operates to shift the burden of proof  both the burden of producing evidence and the burden of persuasion  onto the moving ship. Delta Transload, 818 F.2d at 449; James River Parishes Co., Inc., 686 F.2d 1129, 1131-33 (5th Cir.1982). The moving ship may rebut the presumption by showing, with a preponderance of the evidence, that the collision was the fault of the stationary object, that the moving ship acted with reasonable care, or that the collision was an unavoidable accident. Bunge Corp. v. M/V Furness Bridge, 558 F.2d 790, 795 (5th Cir.1977), cert. denied 435 U.S. 924, 98 S.Ct. 1488, 55 L.Ed.2d 518 (1978); see also, Delta Transload, 818 F.2d at 449; James, 686 F.2d at 1132; Woods v. United States, Dept. of Transportation, 681 F.2d 988, 990 (5th Cir.1982). Ultimately, the presumption derives from the commonsense observation that moving vessels do not usually collide with stationary objects unless the vessel is mishandled in some way. Delta Transload, 818 F.2d at 449; Bunge, 558 F.2d at 795.
837 F.2d at 1326.
[15] McDonald was charged with violating section 310.101(1), Florida Statutes (1986 Supp.), and rule 21SS-8.007(1)(k), Florida Administrative Code. A violation of the statute or rule carries a maximum penalty of license revocation. Fla. Admin. Code Rules 21SS-7.005(1)(a), 21SS-8.007((2)(b).